* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly before the Commission, and this is the agency of proper jurisdiction for this action.
2. All parties have been correctly designated, and there is no question as to the misjoinder or nonjoinder of parties.
3. On the dates in question, the parties were subject to, and bound by, the provisions of the North Carolina Workers' Compensation Act.
4. At all relevant times, an employment relationship existed between the parties.
5. ACE USA was the third party administrator for the self-insured employer.
6. Plaintiff's average weekly wage was $688.00.
7. Plaintiff's alleged dates of injuries are on or around December 23, 2002 (specific traumatic incident), and August 3, 2003 (on or around this time is when disability due to carpal tunnel began).
In addition, the parties stipulated into evidence the following:
1. Packet of medical records, discovery responses, and job descriptions marked as Exhibits 1 through 8.
2. Packet of Industrial Commission forms with attachments.
The Pre-Trial Agreement dated August 18, 2004, which was submitted by the parties, is incorporated by reference.
 * * * * * * * * * * *
Based upon the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 49 years old, is a high school graduate, and has completed some technical courses at a local community college. On July 11, 1989, he began working for defendant, a company which manufactured heads and blocks for diesel engines. Over the course of his employment, he worked in various areas of the plant. In approximately 1999 he was transferred from the block line to the C-encore line, where he worked until the times in question.
2. According to Consolidated Diesel Company's medical records, a physical examination was conducted of plaintiff at the time of hiring, and the records reveal that he was in excellent health. Plaintiff's duties were to operate a machine line that produced diesel engine heads. According to Consolidated Diesel's job description, the work duties involved continuous carrying and lifting of objects that weighed up to 24 lbs. Furthermore, his duties included continuous repetitive actions of his upper extremities. These repetitive actions included using his hands to do simple grasping, fine manipulation, and firm grasping.
3. In order to perform his job, plaintiff used various hand-held tools on a daily basis, for several hours a day. In the earlier part of his employment, plaintiff used a hand held tool called an "air gun," which had a vibrating motion. Plaintiff used this tool for about 4 to 5 years — which included the late 80's up until some time in the early to mid 90's. Plaintiff used the air gun to pull out something called a "sleeve" from the machine when it sometime became damaged. Plaintiff would insert the air gun into the machine to tighten the sleeve down, and when he did this the air gun would make a jumping, vibrating movement. The human resource director, Larry Williams, later testified that this tool was used whenever there was a defective part that needed repairing. Furthermore, Mr. Williams testified that there may have been times when plaintiff had to use the air gun three times per week, but there were weeks when he didn't use it at all.
4. Plaintiff used another hand tool, which he called a "gauge," to check to see if the engine heads/parts met certain specifications. To determine whether a head met the specifications, plaintiff had to place the gauge into each hole located on the head/part. Once he inserted the gauge into the hole, he had to twist it to a certain degree and depth. The twisting movement was similar to the movement used to turn a screw or bolt. Plaintiff had to inspect every twelfth part and gauge every twenty-fourth part. Depending on how many hours he worked or how many parts/heads the machine produced, he would gauge anywhere from 4 times a day to 5 or 6 times a day. Gauging required placing the measuring tool into each hole on the engine, and some engines had up to twenty-five or twenty-six holes that each required gauging. Gauging took up to 8 to 12 minutes and plaintiff had to gauge fast.
5. Plaintiff had to use his hands for just about everything he did at work. He had to use his hands to load the parts (engine heads) on and off the machine, through the use of a hoist. In performing this particular job duty, he had to bend down to hook the hoist chain to the engine head. After hooking the chain to the engine head, he would press a button, which activated the chain hoist. The chain hoist would lift the engine head, but plaintiff had to push and pull on the hoist chain in order to guide the head into a basket. Plaintiff performed these duties continuously throughout the day.
6. On or around December 23, 2002, while plaintiff was bending down to hook the hoist chain onto an engine head, he experienced a very sharp pain in the right side of his neck. Immediately his neck became stuck in position, and he could not move it. Simultaneously, plaintiff experienced pain in his shoulder that radiated down his right arm and right hand. Since his shift was almost complete, plaintiff continued working, believing that the pain in his neck would subside. However, the pain did not go away, and by the end of the day he was still incapable of moving his neck. This incident constituted a specific traumatic incident of the work and its consequences are compensable under the Workers Compensation Act.
7. This incident occurred just before the Christmas vacation, and plaintiff believed rest would take care of the pain in his neck. However, the pain did not subside, so plaintiff contacted Dr. Chamberlain around the last week of December 2002. Dr. Chamberlain is plaintiff's primary physician. Dr. Chamberlain then referred plaintiff to Dr. Martinez, a neurosurgeon.
8. On January 6, 2003, plaintiff saw Dr. Martinez for the pain in his neck. Dr. Martinez ordered an MRI, which revealed a herniated cervical disc at C5-C6. Medical notes dated January 20, 2003, state that Dr. Martinez also believed that plaintiff was suffering from double-crush syndrome with a cervical radiculopathy and carpal tunnel syndrome. The medical notes dated January 27, 2003 stated that Dr. Martinez was able to get a report of an EMG/NCS conducted on plaintiff in the spring of 2002. That report suggested that plaintiff might have carpal tunnel syndrome, but a definite diagnosis had not been made. Dr. Martinez also conducted a cervical myelogram, which revealed that plaintiff had a herniated disc at C5-C6 with calcification. Plaintiff notified Defendant-Employer's nurse, Charlotte James, of the findings from the MRI and myelogram via a phone call, and this was noted in Consolidated Diesel's medical record dated January 27, 2003. Additionally, Consolidated Diesel's medical records contain a note dated January 22, 2003, stating that a note from plaintiff's doctor had been sent, indicating that plaintiff was having a cervical myelogram.
9 On January 29, 2003, Dr. Martinez performed an anterior cervical discectomy and fusion with a Spine-Tech cage. Following the surgery, plaintiff was taken out of work in order to recover. He was out of work from late January of 2003 until sometime in June 2003.
10. After the surgery, plaintiff felt some relief from the pain. His arm stopped aching and the pain in his neck subsided. However, he complained to Dr. Martinez that a month or so after the surgery he began to experience dizziness whenever he moved his neck. He was prescribed Valium 2mg three times a day to help him with the dizziness and Lortab for the pain. During his recovery period, plaintiff continued to see Dr. Chamberlain, who monitored his overall condition. Because of the dizziness he was experiencing, plaintiff was referred to an otolaryngology hospital.
11. Plaintiff returned to work sometime in July of 2003. However, sometime in early August or late July of 2003, while pushing and pulling on a chain hoist at work, he felt a pain and a snap in the palm of his right hand. His palm immediately became very sore. Plaintiff saw the plant nurse for the pain, and was given a wrist splint to wear. The pain in his hand made it difficult for him to perform his job. After this incident, he began to experience tingling and numbness in his right hand. It became difficult for him to grasp and hold objects. The pain also began to affect his rest at night. So around August 28, 2003, Dr. Chamberlain took him out of work temporarily. Plaintiff testified that he was out of work for only a few days. He eventually returned to work sometime in September of 2003.
12. Plaintiff continued to experience difficulty in lifting and carrying objects at work. He also had trouble gauging the heads. He reported this to Dr. Chamberlain who then gave plaintiff strict work restrictions. In a Patient Work Restriction form, dated October 21, 2003, Dr. Chamberlain restricted plaintiff from doing any type of repetitive movement using his hands and doing any type of continuous lifting. When plaintiff gave Consolidated Diesel the work restrictions prepared by Dr. Chamberlain, he was informed that there was no work available that fell within those restrictions, corroborated by Charlotte James at the hearing. Later, in a letter dated October 27, 2003, Dr. Chamberlain said that plaintiff was having "significant problems with dizziness and pain in his shoulders to the point where he had trouble lifting and carrying." The letter further stated that plaintiff was unable to operate machinery due to the medications that he was on and that if light duty was unavailable then plaintiff would be out of work for the "indefinite future, secondary to medical illness." Consolidated Diesel then placed plaintiff on Consolidated Diesel's long-term disability plan. Dr. Chamberlain then referred plaintiff to Dr. Deans, a neurologist, to be evaluated for the reoccurring numbness and pain he was experiencing in both hands.
13. Dr. Deans presumptively treated plaintiff for carpal tunnel syndrome, by giving him a short course of oral steroids. Plaintiff was also placed on wrist splints. However, when plaintiff continued to have persistent symptoms, Dr. Deans performed an EMG and nerve conduction study. This study was conducted in January of 2004. The EMG and nerve study revealed that plaintiff had moderate carpal tunnel syndrome in both hands. Because the symptoms were persistent, and did not react to conservative methods of treatment, Dr. Chamberlain referred plaintiff to Dr. Parks for carpal tunnel release surgery.
14. Dr. Parks performed carpal tunnel release surgery to plaintiff's right and left hands in March and May of 2004, respectively. After the surgery, plaintiff had some decrease in numbness, but he still continued to have pain in his hands. Dr. Parks referred plaintiff to physical therapy but, according to the physical therapy notes, plaintiff continued to have difficulty grasping and holding objects. Because plaintiff continued to have pain in his hands, Dr. Chamberlain referred him to Dr. Good, another neurologist, for further evaluation.
15. In June of 2004, Dr. Good examined plaintiff and conducted electrical studies. His findings were that he had median neuropathies bilaterally supporting carpal tunnel syndrome, and myofascial pain syndrome of the neck, shoulders, and arms. Dr. Good recommended another MRI of the cervical spine. After the MRI, Dr. Good was still unable to determine what was causing plaintiff's persistent pain.
16. After the cervical disc fusion and carpal tunnel release surgery, plaintiff has had some relief from his pain. However, he still experiences pain and has difficulty grasping certain objects. He continues to have pain syndrome in his neck, shoulders, and arms. Currently, he is being evaluated by another neurosurgeon to determine if he should undergo a second cervical surgery.
17. Plaintiff's last day at work was around October 27, 2003. He has not returned to work for Consolidated Diesel or any other employer.
18. It does not appear from the medical records that plaintiff was treated for either carpal tunnel syndrome or a cervical disc problem in 2002 before the first incident in question. However, plaintiff was treated during that year for general body pain and aches which had been diagnosed by at least one physician as fibromyalgia.
19. Dr. Chamberlain has been for many years and continues to be plaintiff's personal physician. He and other members of his practice have continually treated plaintiff since at least 1995. He is very familiar with the work plaintiff did at Consolidated Diesel and the relationship of the work to plaintiff's injury and illness that have kept him out of work. He is more familiar with this relationship than the doctors to whom he referred plaintiff for treatment in their specialties (i.e., Dr. Martinez for nurosurgery, Dr. Deans for neurology, and Dr. Parks for carpal tunnel surgery). In a letter to plaintiff's counsel dated April 26, 2004, and admitted into evidence, Dr. Chamberlain stated unequivocally that plaintiff's bilateral carpal tunnel syndrome
 had likely been caused by the patient's previous employment [with Consolidated Diesel]. There was a high degree of repetitive motion required and that the onset of symptoms temporally could be associated with his employment. Certainly, if not absolutely, caused by his employment was aggravated and worsened by his employment. I am uncertain as to whether the patient's cervical disc herniation was caused in any way by his employment but again, certainly would have been aggravated by the employment.
Dr. Chamberlain was of the opinion, and the Full Commission finds as fact, that plaintiff's job at Consolidated Diesel placed him at an increased risk of developing bilateral carpal tunnel syndrome than members of the public not similarly employed.
20. While Dr. Martinez could not state with medical certainty that the specific traumatic incident suffered by plaintiff at Consolidated Diesel on or about December 23, 2002, caused or significantly aggravated plaintiff's cervical disc herniation, he stated that
 the only way to determine whether something like that can cause a disk is just historical. [For example, t]he kid tells me that he was doing something and he noticed something sharp that would indicate that the disc ruptured at that time, then I will have an indication that that was more likely than not the cause.
Plaintiff testified, and the Full Commission finds as fact, that on or about December 23, 2002, while he was loading heavy engine heads, he felt a pain in his neck. "I've never felt it that that strong." This would appear to meet Dr. Martinez's causation requirement.
21. Dr. Deans testified, and the Full Commission finds as fact,
 If the grasping and twisting that he's doing, like screwing parts in and so forth — you know, is forceful, then I would say — and he's doing that repeatedly over a substantial interval of time, then I would say that that would put him at an increased risk for carpal tunnel syndrome.
The Full Commission finds that the grasping and twisting performed by plaintiff at Consolidated Diesel was forceful and that plaintiff did it repeatedly over a substantial interval of time and that his job placed him at an increased risk for carpal tunnel syndrome.
22. The fact that Dr. Parks, the plastic surgeon who performed carpal tunnel release surgery on both of plaintiff's wrists, opined that carpal tunnel is multifactorial did not detract from his opinion that plaintiff's active hand use job could provide some tendon swelling, and that could be part of the multifactorial etiology of carpal tunnel syndrome.
To recover for the occupational disease of carpal tunnel syndrome, plaintiff need not prove that the job was the sole cause of the disease, merely that it was a significant contributing factor. Here, it was.
23. The greater weight of the medical evidence establishes that plaintiff's disability with respect to his cervical herniation was the proximate result of the specific traumatic incident he suffered at work on or around December 23, 2002, and his disability with respect to his carpal tunnel syndrome also proximately resulted from his work with Consolidated Diesel.
24. From December 23, 2002, until his recovery from back surgery, plaintiff was unable to earn any wages by reason of his compensable specific traumatic incident. During the period of his recovery from back surgery, plaintiff's compensable carpal tunnel syndrome began to be a factor in plaintiff's inability to earn wages. After plaintiff's recovery from back surgery the carpal tunnel syndrome and its sequelae became the causes of plaintiff's inability to earn wages.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. (I.C. 364195) On or about December 23, 2002, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant in that he sustained an injury to his neck as the result of a specific traumatic incident of the work assigned. The injury aggravated and exacerbated a previously nondisabling condition and made it disabling. As a result, plaintiff was not able to earn any wages until after his recovery from back surgery that was necessitated by the specific traumatic incident. N.C. Gen. Stat. § 97-2 (6).
2. (I.C. 364195) Plaintiff is entitled to benefits under the Workers' Compensation Act for his cervical spine condition. N.C. Gen. Stat. § 97-2 et seq.
3. (I.C. 367025) Plaintiff has proved that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment and which excluded all ordinary diseases of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53(13); Bookerv. Duke Medical Center, 297 N.C. 458 (1979).
4. (I.C. 367025) Plaintiff is entitled to benefits under the Workers' Compensation Act for his bilateral carpal tunnel syndrome. N.C. Gen. Stat. § 97-2 et seq.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney fees and to appropriate credits as hereafter described, Consolidated Diesel Co. shall pay to plaintiff seventy-five percent of $458.67 per week from December 23, 2002, to the present and continuing for so long as plaintiff is unable to work by reason of his compensable specific traumatic incident and by reason of the sequelae to his compensable bilateral carpal tunnel syndrome. Defendant shall pay interest at 8% per year from August 18, 2004, on $458.67 per week net of credit herein described.
2. Not subject to offset or credit, defendant shall pay to plaintiff's attorney as a reasonable attorney's fee $114.67 per week from December 23, 2002, to the present and continuing for so long as plaintiff is unable to work by reason of his compensable specific traumatic incident and by reason of the sequelae to his compensable bilateral carpal tunnel syndrome.
3. Defendant is allowed to credit against plaintiff's 75% weekly payments on a week by week basis of no more than 75% of short term and long term disability payments paid to plaintiff from any disability plan funded solely by defendant.
4. Defendant shall pay or reimburse those who paid all reasonable medical expenses, subject to ceilings established by the North Carolina Industrial Commission Medical Fee Schedule, by reason of plaintiff's compensable specific traumatic incident and by reason of plaintiff's compensable bilateral carpal tunnel syndrome and its sequelae to the extent such were reasonably related to lessening the period of disability or lessening pain.
5. Defendant shall pay the costs.
This eighth day of May, 2006.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_________________ PAMELA THORPE YOUNG VICE CHAIRMAN